Albert G. Stoll, Jr. SBN 164649
E-mail: astoll@stoll-law.com
Jessica Juarez, SBN 269600
Email: jessica@stoll-law.com
ALBERT G. STOLL, JR. | A LAW CORPORATION
235 Montgomery Street, Ste 1220
San Francisco, California 94133
Phone: (415) 576-1500
Fax: (415) 576-1501
Attorneys for Plaintiffs Nathaniel Foster, Pamela Foster,
Conservatee and Plaintiff Nathaniel Foster, Jr., and Minor Natalie Foster

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Nathaniel Foster, an Individual; Pamela Foster, an Individual; Nathaniel Foster, Jr., by and through his Conservator Nathaniel Foster; and Natalie Foster, a Minor, by and through her Guardian ad Litem, Pamela Foster,<br><br>     Plaintiffs<br><br>     v.<br><br>United Continental Holdings, Inc. dba United Airlines, Inc., a Delaware Corporation; ExpressJet Airlines, Inc. dba United Express, a Foreign Profit Corporation; AirCo Aviation Services dba Delta Global Services, LLC, a Delaware Limited Liability Corporation<br><br>     Defendants. | CASE NO.<br>**Complaint for Damages**<br><br>1. Negligence, Negligence per Se (in Violation of Air Carrier Access Act, 49 U.S.C. §41705 *et seq)*;<br>2. Negligent Hiring, Supervision & Retention<br>3. Breach of Contract;<br>4. Negligent Misrepresentation;<br>5. Intentional Infliction of Emotional Distress.<br><br>**<u>DEMAND FOR JURY TRIAL</u>** |

    Plaintiff Nathaniel Foster; Pamela Foster, an Individual; Nathaniel Foster, Jr. aka "NJ Foster", by and through his father and Conservator Nathaniel Foster; and Natalie Foster, a Minor, by and through her mother and proposed Guardian ad Litem, Pamela Foster (collectively referred to as "Plaintiffs") hereby file this Complaint for Damages and Demand for Jury Trial against Defendants United Continental Holdings, Inc. dba United Airlines, Inc., a Delaware Corporation; ExpressJet Airlines, Inc.

dba United Express, a Foreign Profit Corporation; and AirCo Aviation Services, LLC dba Delta Global Services, LLC, a Delaware Limited Liability Corporation and allege as follows:

I.      NATURE OF THE ACTION

This actions seeks damages on behalf of Plaintiff and Conservatee NJ Foster, a 21 year old disabled young man and his family, co-Plaintiffs Nathaniel Foster, Pamela Foster and Natalie Foster. Plaintiff and Conservatee NJ Foster suffered catastrophic personal injury and has been in a coma following Defendants' actions and omissions in the deplaning process of UA Flight No. 4193 on February 8, 2019.

In sum, this action alleges that common carriers, Defendant United Airlines and ExpressJet Airlines dba United Express failed to abide by the standard of care owed to disabled passengers by failing to have trained staff (and/or ensuring that their contractor and/or subcontractors Defendant AirCo Aviation Services dba Delta Global Services, LLC are trained appropriately), necessary personnel and assistive devices necessary for the safe transport of disabled passengers.

II.     JURISDICTION AND VENUE

a.   This court has federal diversity jurisdiction pursuant to 28 U.S.C.A. 1332, *et seq.* as the parties are completely diverse in citizenship and the amount in controversy exceeds $75,000.

b.   Venue is proper in this district as all Plaintiffs are residents of Pleasant Hill, California whereas Defendant United Airlines, Inc. is a Delaware corporation with its principal place of business in Chicago, Illinois. Defendant ExpressJet Airlines is a foreign profit corporation with headquarters in Atlanta Georgia. Defendant AirCo Aviation LLC dba Delta Global Services, LLC is a Limited Liability Delaware Corporation with headquarters in Atlanta, Georgia.

III.    PARTIES

a.  PLAINTIFFS

i.   **Plaintiff Nathaniel Foster** is the father and Conservator of Plaintiff Nathaniel Foster, Jr.  Attached hereto as **Exhibit 1** is the Order Appointing Temporary Conservator Status to Plaintiff Nathaniel Foster dated March 22, 2019. On February 8, 2019, the date of the incident of this lawsuit, Plaintiff Nathaniel

Foster was traveling with his family and co-Plaintiffs: son, NJ; wife, Pamela, and daughter, Natalie Foster. Plaintiff Nathaniel Foster works in management for the U.S. Postal Service.  At the time of the subject incident, Plaintiff Nathaniel Foster was living in Pleasant Hill, California in Contra Costa County with his family.

ii. **Plaintiff and Conservatee Nathaniel Foster, Jr. aka "NJ" (hereinafter "Plaintiff NJ Foster"**) is a twenty-one (21) year old young man who at the time of the incident had full mental capacities, was verbal and attended college to fulfill his dream of becoming a physician.  Plaintiff NJ Foster is also a qualified individual with a disability, as he was quadriplegic at the time of the incident, using a tracheal tube, ventilator and a power wheelchair following an unrelated incident which caused spinal cord injury (not subject to this suit) that occurred on September 1, 2016.  Plaintiff NJ Foster's disability affects major life activities such as bathing, dressing, feeding, and attending school.

iii. Following the subject incident of the instant lawsuit that occurred on February 8, 2019 at the Monroe Regional Airport in Louisiana, Plaintiff and Conservatee NJ Foster has been in a coma.  Prior to the incident, Plaintiff NJ Foster was living with his family in Pleasant Hill, California in Contra Costa County.  .

iv. **Plaintiff Pamela Foster** is the mother of Plaintiff NJ Foster and was traveling with her immediate family and co-Plaintiffs at the time of the incident. Plaintiff Pamela Foster works as an Economist with the U.S. Department of Labor. Plaintiff Pamela Foster lives with her immediate family in Pleasant Hill, California in Contra Costa County.

v. Plaintiff Pamela Foster seeks to serve, with the court's permission, as Guardian ad Litem for her minor daughter, Natalie Foster (age 16). A Petition for Appointment of Pamela Foster, Guardian ad Litem and Proposed Order thereon has been attached hereto as **Exhibit 2**.

vi. **Plaintiff Natalie Foster** is a minor, age 16 and the sister of Plaintiff Conservatee NJ Foster. Plaintiff Natalie Foster was traveling with her family at the time of the incident. Plaintiff Natalie Foster attends high school and lives at home with her immediate family in Pleasant Hill, California in Contra Costa County.

b. **DEFENDANTS**

i. On information and belief, **Defendant United Continental Holdings, Inc., dba United Airlines, Inc.** (hereafter, "Defendant United Airlines, Inc.") is a Delaware corporation and commercial airline, with its principal place of business in Chicago, Illinois.

1. Defendant United Airlines, Inc. is authorized to do business in California and conducts substantial business in and out of the San Francisco International Airport (SFO).

2. The Division of Corporations in Delaware lists the entity's address as 233 South Wacker Drive, WHQCT – 14th Floor, Chicago, IL. 60606.

3. The most recent Statement of Information dated June 13, 2018 for Defendant United Airlines, Inc. lists Oscar Munoz as the CEO, Jennifer L. Kraft as Secretary and Gerald Laderman as the company's CFO.

4. The California Corporate Number is listed as C1249108.

5. The Agent for Service of Process is listed as C T Corporation located at 111 Eighth Avenue, 13th Floor, New York, NY 10011.

6. Defendant United Airlines, Inc. is an air carrier holding a certificate of public convenience and necessity issued by the Secretary of Transportation under 49 USC § 41102.

7. At all times herein mentioned, Defendant United Airlines, Inc., was and is a common carrier for hire engaged in the transportation of passengers in both domestic and international air travel.

8. On information and belief, Defendant United Airlines, Inc. owns, operates and maintains the aisle chair and jet bridge on which the subject incident occurred.

9. Said defendant owned, operated, controlled, serviced, maintained and flew, through its operators, partners, agents, subcontractors and employees acting in the course and scope of their employment, certain aircraft including the aircraft used for Flight Nos. 540 and 4193 on February 8, 2019, from San Francisco, California to Houston, Texas onto Monroe, Louisiana, respectively on which Plaintiffs flew.

ii. **Defendant ExpressJet Airlines, Inc.** dba **United Express** is a foreign, for profit corporation and commercial airline with a Control Number of 12001365 as listed by the Georgia Corporations Division.

1. The Registered Agent is C T Corporation System with an address listed as 289 South Culver Street, Lawrenceville, Georgia 30046-4805.

2. Russell A. Childs is listed as the CEO of ExpressJet Airlines, Inc., Robert J. Simmons is listed as the CFO and Terry Vais is listed as the company's Secretary.

3. Defendant ExpressJet Airlines, Inc. is an air carrier holding a certificate of public convenience and necessity issued by the Secretary of Transportation under 49 USC section 41102.

4. At all times relevant herein, Defendant ExpressJet Airlines, Inc. was and is, a carrier of passengers by air, with its principal office address listed as 100 Hartsfield Center Parkway, #700 in Atlanta, Georgia 30354.

5. On information and belief, Defendant ExpressJet Airlines, Inc. dba United Express co-owns, operates and maintains the aisle chair and jet bridge on which the subject incident occurred.

6. On information and belief, Defendant ExpressJet Airlines, Inc. dba United Express owned, operated, controlled, serviced, maintained and

flew, through its operators, partners, agents, subcontractors and employees acting in the course and scope of their employment, the aircraft used for Flight No. 4193 on February 8, 2019, from Houston, Texas onto Monroe, Louisiana, respectively.

iii. **DEFENDANT AirCo Aviation, LLC dba DAL Global Services, Inc. dba Delta Global Services, LLC** also known as "DGS" and/or "DAL" is a Limited Liability Delaware Corporation. DAL has its principal office located at 1007 Virginia Avenue, Suite 100 in Atlanta, Georgia 30354.

1. **According to its website,**[1] "*Delta Global Services is one of the leading suppliers of aviation services, providing domestic and international aviation services to multiple airline business partners throughout the United States, Guam, and the Bahamas…*"

2. On information and belief, Defendant DAL Global Services contracted with Defendant United Airlines, Inc. and Defendant ExpressJet, Inc. dba United Express to provide baggage handling assistance.

3. An employee ramp agent of AirCo Aviation LLC dba Defendant DAL Global Services (name unknown) was involved in the deplaning process of Plaintiff NJ Foster at the Monroe Regional Airport at the time of the incident.

4. According to Defendant's website, ramp agents are "*responsible for marshalling aircraft in and out of the gate, loading, unloading and sorting freight, mail and baggage in a safe manner while also achieving on-time departures and arrivals.*"

## IV.     FACTUAL ALLEGATIONS

1. Plaintiffs re-allege and incorporate by reference all preceding paragraphs as fully set forth herein.

---

[1] https://www.dalgs.com/dgs-job-search/; (Last visited April 3, 2019)

2. On February 6, 2019, Plaintiffs experienced a death in their family. Plaintiff Pamela Foster's sister, Vickey Johnson passed away. Ms. Johnson was a resident of Bastrop, Louisiana.

3. The family decided to travel to Louisiana in order to attend the funeral.

4. On the same day, Plaintiff Pamela Foster called the Accessibility desk for Defendant United Airlines, Inc. in order to make disability related flight arrangements for her son, Plaintiff NJ Foster.

5. The Accessibility desk via an agent (name unknown, referred to hereinafter as "Agent 1") directed Plaintiff Pamela Foster to first purchase airline tickets prior to calling the accessibility desk.

6. Plaintiff Pamela Foster did as directed and purchased (with a United Chase Mileage Plus Explorer credit card) four round-trip tickets from San Francisco to Houston, Texas and going onto Monroe, Louisiana with a departure date of February 8, 2019 from San Francisco International Airport ("SFO").

7. Plaintiffs' itinerary was as follows: UA Flight No. 540: departing San Francisco (SFO), California at 7:15 a.m. to Houston, Texas (IAH-BUSH INTL) with an arrival time of 1:02 p.m and UA Flight No. 4193: departing Houston, Texas at 2:20 p.m. and arriving in Monroe, Louisiana (MLU) at 3:29 p.m.

8. Plaintiff Pamela Foster then immediately called back Defendant United Airlines' accessibility desk to make the necessary arrangements for her son, NJ Foster.

9. During the call, Plaintiff Pamela Foster informed the operator (name unknown, referred to as Agent #2) that her son required special assistance given his disability – he was a quadriplegic, used a power wheelchair, tracheal tube and ventilator.

10. Plaintiff Pamela Foster inquired about the size of the planes to fly from San Francisco to Houston and from Houston to Monroe and requested assurances that the necessary assistance was available in the embarking and disembarking process for her son, Plaintiff Conservatee NJ Foster.

11. The operator, Agent #2 at Defendant United Airlines accessibility desk repeatedly communicated to Plaintiff Pamela Foster not to worry and that the outbound plane from Houston, Texas to Monroe, Louisiana was even larger than the plane from SFO to Houston and that all staffing would be provided to embark and disembark her son.

12. The operator at the accessibility desk, Agent #2 repeatedly communicated to Plaintiff Pamela Foster that traveling with Plaintiff NJ Foster was not a problem and that it was able to provide safe passage to Plaintiff NJ Foster.  In all, the phone call with the United Airlines Accessibility Desk agent (Agent #2) lasted approximately thirty (30) minutes.

13. On February 8, 2019, Plaintiffs arrived at the departure gate for UA Flight No. 540 at SFO.

14. In order to embark and disembark Plaintiff NJ Foster, it was necessary for him to be transferred from his personal power wheel chair to a narrower "aisle chair" at the jetway.

15. Arriving at the departure gate at SFO, a single wheelchair assistant appeared from PrimeFlight Aviation Services.

16. The assistant himself called additional staff to help transfer Plaintiff NJ Foster from his personal power wheel chair to an aisle chair.

17. Approximately 4 attendants (Names Unknown) transferred Plaintiff Conservatee NJ Foster out of his personal power wheelchair and placed him onto an aisle chair with leg, lap, and chest straps, transporting him onto the plane without incident.

18. Plaintiffs departed SFO at or about 7:15 a.m. flying to Houston, Texas on a Boeing 737-800 airplane. Plaintiffs arrived in Houston, Texas at approximately 1:02 p.m.

19. Upon arrival to Houston, four or more attendants (Names Unknown) provided deplaning assistance to Plaintiff NJ Foster.

20. After making the transfer onto another plane, Plaintiffs boarded UA Flight No. 4193 to Monroe, Louisiana.

21. Plaintiff NJ Foster boarded the ERJ-145 airplane with the assistance of approximately 4 or more attendants (Names Unknown) who again used the leg, lap and chest straps on the aisle chair provided.

22. UA Flight No. 4193 was operated by Defendant ExpressJet Airlines, Inc. dba United Express.

23. Upon arrival at the Monroe Regional Airport on or about 3:29 p.m., the female steward (Name Unknown, Agent #3) inside the Express Jet, Inc. dba United Express plane communicated to Plaintiffs to remain in their seats until the entirety of the plane disembarks in order to receive disembarking assistance for Plaintiff NJ Foster.

24. Plaintiffs waited approximately twenty (20) minutes in their seats and observed that the Captain of the flight disembarked from the plane as well.

25. Once all passengers and the Captain had deplaned, the ExpressJet, Inc. steward (Agent #3) called for assistance.

26. Plaintiffs observed that a sole, African American heavy-set woman, (Name Unknown - (Agent #4) arrived with an aisle chair. This woman identified herself as a "Supervisor" to Plaintiffs.

27. On information and belief, Agent #3 was a United Airlines employee working at the Monroe Regional Airport.

28. Plaintiffs Nathaniel Foster and Pamela Foster communicated to Agent #4 that their son is quadriplegic and needed the assistance of additional personnel to transport him off of the plane. Plaintiffs communicated that typically four (4) to six (6) individuals had been used in the deplaning process for their son on prior flights.

29. Agent #4 appeared to get upset and communicated to Plaintiffs that she knew how to transport disabled passengers, stating, "*I know what I'm doing*" and reluctantly called for an additional employee from inside the Monroe Regional Airport for assistance.

30. A second, African American young woman (approximately 115 pounds, "Agent #5") came to assist with Plaintiff NJ Foster's deplaning process.

31. Again, Plaintiffs Nathaniel and Pamela Foster communicated their request for additional personnel.

32. Agent #4 became even more visibly upset and communicated "*Fine. Do it yourself, then...I'm out.*"

33. Agent #5 remained in the plane with Plaintiffs, holding onto Plaintiff NJ's ventilator.

34. As Agent #4 was leaving the airplane, she verbally called out to a nearby male, an African American baggage claim handler, an employee of Defendant AirCo Aviation LLC dba Delta Global Services, LLC dba Delta Ground Services (Name Unknown, Agent #6).

35. Agent #6 boarded the plane and moved Plaintiff NJ from his seat onto the aisle chair.

36. Agent #6 secured Plaintiff NJ to the aisle chair with the use of the sole restraint, a cross chest strap, that made an "x" formation.

37. On information and belief, the aisle chair used in the deplaning process was not in accordance with the provisions set forth in the Air Carrier Access Act, 14 C.F.R. §382 et seq.

38. No further assistance was forthcoming.

39. ExpressJet, Inc. dba United Express flight personnel (Agent #3) did not offer to assist, nor did she assist Plaintiff NJ Foster in disembarking from the plane.

40. Plaintiff Nathaniel Foster repeatedly urged Agent #6 to go slow and be careful with his son.

41. Plaintiff Nathaniel Foster walked in front of Plaintiff NJ's aisle chair, facing his son in the deplaning process.

42. Agent #6 pushed the aisle chair occupied by Plaintiff Conservatee NJ Foster.

43. Agent #5 carried Plaintiff Conservatee NJ Foster's ventilator.

44. Plaintiff Conservatee NJ Foster's feet were dragging on the airplane's flooring as he was wheeled through and out of the airplane.

45. Agent #5 aggressively pushed the aisle chair through the singular aisle of the small plane, causing Plaintiff NJ Foster to sway and slip over the right side of the aisle chair on two separate occasions prior to reaching the plane's threshold.

46. On the first occasion, Plaintiff Conservatee NJ Foster prominently leaned to the right side and was propped up by his father, Plaintiff Nathaniel Foster.

47. On the second occasion, Plaintiff NJ again leaned to the right side but was caught by an interior wall of the plane that propped him up upon exiting from the plane.

48. Upon reaching the plane's threshold, Agent #6 pushed the aisle chair forcefully and caused the aisle chair to move forward violently and then fall back.

49. Plaintiff NJ Foster's body jerked forward and back in response and slouched down into the seat.

50. Plaintiff Pamela Foster asked her son if he was okay and heard her son whisper, "*I can't breathe.*"

51. Plaintiff Pamela Foster immediately began yelling for assistance.

52. Dr. Edgar Leon Feinberg, a thoracic and cardiac surgeon, meanwhile was waiting inside the terminal at Gate 6 to board the plane for his own flight.

53. Upon hearing Plaintiff Pamela Foster scream loudly for help from the jet bridge below, Dr. Edgar Leon Feinberg identified himself as a doctor and offered assistance to the United Airlines agent at Gate 6 (Name Unknown, referred to as Agent #7).

54. In response, Agent #7 audibly "giggled" and communicated to Dr. Feinberg that no help was needed, that he could take his seat because "*we got this*."

55. Dr. Edgar Leon Feinberg went back to his seat and sat down as directed.

56. Meanwhile, Plaintiff Nathaniel Foster looked to his son and immediately noticed that his son looked wide-eyed, fearful, and that his lips were turning a deep purple color.

57. NJ Foster was removed from the wheelchair and laid onto the floor of the jet bridge, attaching the plane to the airport terminal.

58. Agent #5 remained holding Plaintiff's ventilator at all times.

59. Plaintiff NJ Foster went into cardiac arrest.

60. Plaintiff Nathaniel Foster provided CPR to his son.

61. Plaintiff Pamela Foster provided assistance to her son with an Artificial Manual Breathing Unit (also known as an "AMBU" or "AMBU bag").

62. Plaintiff Natalie Foster stood nearby watching her parents attend to her brother, NJ.

63. A police officer, "Private Blue" arrived and took over chest compressions from father, Nathaniel Foster.

64. Approximately three (3) to five (5) minutes later, Dr. Edgar Leon Feinberg was called down to the jetway.

65. Upon arrival to Plaintiff NJ Foster's side, Dr. Feinberg observed that Plaintiff NJ Foster did not have a pulse and began coaching CPR.

66. The fire department arrived at the scene on or about 4:27 p.m. and assumed chest compressions.

67. According to the Fire Department's report, its personnel checked Plaintiff NJ Foster's airway and found that his tracheal tube was not in place, which was also confirmed by an additional medic.

68. Paramedics from Acadian Ambulance Services arrived, took over the CPR and AMBU bag functions and transported Plaintiff NJ Foster (with Plaintiff Nathaniel Foster) to Saint Francis Medical Center in Monroe, Louisiana via ambulance.

69. Plaintiffs Pamela and Natalie Foster were driven to the hospital in a police car.

70. Plaintiff NJ Foster was admitted into the Intensive Critical Care Unit of St. Francis Medical Center in Monroe, Louisiana.

71. Upon arrival, NJ Foster was in a coma.

72. On or about February 19, 2019 Plaintiff NJ Foster was transported from St. Francis Medical Center in Monroe, Louisiana to Kaiser Hospital, Walnut Creek, California via air ambulance.

73. Plaintiff NJ Foster has suffered a significant hypoxic brain injury and has been given a very poor prognosis by his physicians at Kaiser Hospital, Walnut Creek.

74. Plaintiff NJ Foster remains in a coma through the date of filing of this complaint.

75. As a result of the acts and omissions by Defendants and each of them, Plaintiff NJ Foster has been seriously and grievously injured and damaged.

76. Plaintiffs Nathaniel Jr., Nathaniel, Pamela and Natalie Foster suffer and continue to suffer from severe emotional pain and distress.

II.  **CAUSES OF ACTION**

**FIRST CAUSE OF ACTION**
**Negligence and Negligence Per Se**
**(in Violation of Air Carrier Access Act, 49 U.S.C. §41705)**
(All Plaintiffs against All Defendants and Does 1-50)

77. Plaintiffs re-allege and incorporate by reference all preceding paragraphs as fully set forth herein.

78. On or about February 6, 2019, Defendant United Airlines and ExpressJet Airlines agreed to safely carry Plaintiff Conservatee NJ Foster from San Francisco to his final destination of Monroe, Louisiana.

79. At all times herein, Defendants United Airlines and ExpressJet Airlines, were common carriers of persons for hire and as such required to use the utmost care and diligence for safe carriage of passengers, such as Plaintiff Conservatee NJ Foster, and must exercise a heightened degree of skill to provide everything necessary for that purpose.

80. Defendant AirCo Aviation is a contractor or subcontractor of Defendants United Airlines and ExpressJet Airlines.

81. By virtue of Defendants' negligence, the actions and omissions as alleged above on the part of said Defendants, and each of them, is a breach of the terms, both explicit and implied, of the

contract created by selling airplane tickets to Plaintiffs, as well as a breach of Defendants' obligations as common carriers.

82. Plaintiffs had fulfilled all obligations on their part for the contract of safe carriage.

83. As a direct and proximate result of defendants' breach as set out above, Plaintiffs were damaged as alleged herein.

84. Plaintiffs are informed and believe, and therefore allege, that Defendants acting in the course and scope of their employment were negligently responsible in some manner for the occurrences herein alleged, and Plaintiffs damages as herein alleged were legally caused by their conduct.

85. At all times herein mentioned, each and every one of the Defendants herein was the agent, servant and employee, each of the other, and each was acting within the course and scope of his agency, service and employment with the permission, consent and ratification, each of the other.

86. At all times mentioned, Defendants undertook a duty to accommodate Plaintiff NJ Foster in compliance with anti-discrimination provisions for disabled passengers under federal statutes and regulations.

87. The Department of Transportation (DOT) has promulgated regulations, codified at 14 C.F.R. § 382, specifying detailed requirements that airlines must meet to comply with the Air Carrier Access Act (ACAA), 49 U.S.C. § 41705 et seq.

88. Air carriers such as Defendants United Airlines, Inc. and ExpressJet Airlines, Inc. are required to exercise the highest degree of care and diligence for the safe carriage and passage of their ticketed passengers and are required to comply with the provisions of the ACAA in order to avoid injury to its disabled passengers requesting assistance in the onboarding and disembarking processes.

89. 14 C.F.R. §382.95 provides in relevant part,

> *As a carrier, you must promptly provide or ensure the provision of assistance requested by or on behalf of passengers with a disability, or offered by carrier or airport operator personnel and accepted by passengers with a disability, in enplaning and deplaning. This assistance must include, as needed, the services of personnel and the use of ground wheelchairs, accessible motorized carts, boarding wheelchairs, and/or on-board wheelchairs where provided in accordance with this part, and ramps or mechanical lifts.*

90. 14 C.F.R. § 382 was intended to prohibit air carriers from discriminating against passengers on the basis of disability; requiring carriers to make aircraft, other facilities, and services accessible to

disabled passengers; and requires carriers to take steps to accommodate passengers with disabilities. 14 C.F.R. § 382.1.

91. Subpart G of the DOT regulations provides that carriers shall ensure that individuals with disabilities are to be provided with assistance in enplaning, deplaning, and in making flight connections and transportation between gates.

92. Subpart J of the DOT regulations requires training for personnel involved in providing boarding and deplaning assistance. Specifically found within the ACAA are specific requirements regarding the training carriers must provide for personnel involved in providing boarding and deplaning assistance:

　　i.　14 C.F.R. § 382.141(a)(1)(iii) (*requiring training to proficiency concerning use of boarding and deplaning assistance equipment and procedures*);

　　ii.　*id.* § 382.141(a)(5) (*requiring carriers to develop a program to provide refresher training as needed to maintain proficiency*);

　　iii.　*id.* § 382.143 (*detailing requirements for when training must occur*);

　　iv.　*id.* § 382.145 (*requiring carriers to retain records regarding initial and refresher training for employees*);

　　v.　*id.* § 382.141(a)(i)(iii) (*requiring training to proficiency concerning use of boarding and deplaning assistance equipment and procedures that safeguard the safety and dignity of passengers*);

　　vi.　*id.* § 382.141 (a)(1)-(6) (*Carriers must develop a program to provide training and refreshing training to maintain proficiency, and provide or ensure that its contractors provide training to the contractors' employees concerning travel by passengers with a disability.*)

　　vii.　*id.* § 382.15 (*Carrier must make sure that their contractors provide services to the public that meet the requirements of this part that would apply to you if you provided the services yourself...carriers must include an assurance of compliance in contracts with contractors...Carriers remain responsible for your contractors' compliance with this part and for enforcing assurances in your contracts with them.*)

93. As provided above, Plaintiff Pamela Foster requested that Defendant United Airlines provide her son with embarking and disembarking assistance on February 6, 2019.

94. On the same day, Defendant United Airlines agreed to provide transport and the necessary disability assistance to NJ Foster, causing Plaintiffs to purchase airlines tickets for safe passage.

95. On February 8, 2019 the family flew from SFO to Monroe Louisiana via Houston.

96. On February 8, 2019 Plaintiff NJ Foster, a quadriplegic individual, used a tracheal tube and ventilator and thereby, was in the class of persons intended to be protected by the ACAA.

97. Defendant United Airlines, Inc. and Defendant ExpressJet Airlines, Inc. dba United Express are both carriers, and agreed to provide the requested assistance for Plaintiff Conservatee NJ Foster.

98. Defendant United Airlines, Inc. and Defendant ExpressJet Airlines, Inc. breached their duty of care owed to Plaintiff NJ by violating the requirements of the ACAA as follows:

    a.  by failing to ensure that the request for disability assistance is recorded and properly transmitted to the personnel responsible for providing the accommodation, *id*. at §382.81, §382.141;

    b.  by failing to properly train their employees regarding safe deplaning procedures for Plaintiff NJ Foster, a disabled passenger, *id*.;

    c.  by failing to properly train their contractors regarding safe deplaning procedures for Plaintiff NJ Foster, a disabled passenger, *id*.;

    d.  by failing to provide safe deplaning assistance as requested, 14 C.F.R. § 382.95;

    e.  by failing to provide the personnel necessary for the safe deplaning process of Plaintiff NJ Foster, *id.*;

    f.  by failing to adhere to safety measures, protocols for the safe deplaning process for Plaintiff Conservatee NJ Foster;

    g.  by failing to use the appropriate devices for providing assistance in the deplaning of Plaintiff Conservatee NJ Foster, a disabled passenger, 14 C.F.R § 382.95;

    h.  by failing to properly maintain and/or provide ACAA compliant aisle chairs, 14 C.F.R. § 382.65;

    i.  by failing to provide compliant seating accommodations to Plaintiff Conservatee NJ Foster, 14 C.F.R § 382.81; and

j.  by having an agent abandon Plaintiff Conservatee NJ Foster when Plaintiffs Nathaniel and Pamela Foster merely asked for additional personnel in the deplaning process of their son;

k.  by evidencing reprehensible conduct such as the "giggling" in response to a good Samaritan (thoracic and cardiac surgeon) coming forward to offer medical attention upon hearing a mother's desperate cry for help;

l.  by failing to permit a Good Samaritan physician to provide needed medical attention to Plaintiff NJ Foster upon hearing cries for help.

99. Defendants acts and omissions as described above were a substantial factor in bringing about the harm to Plaintiff NJ Foster and his family, co-Plaintiffs and proximately caused injury to Plaintiffs.

100.   The injuries suffered by Plaintiff Conservatee NJ Foster were the kind of occurrences the Air Carrier Access Act was designed to prevent.

101.   As a direct and proximate result of Defendants' failure to follow federal Statutes and Regulations and instead, in acting recklessly, maliciously, lacking even slight care and diligence, and exhibiting utter disregard for the dictates of prudence, amounting to complete neglect of the rights of others and the rights of disabled passengers, Plaintiff Conservatee NJ Foster suffered life altering catastrophic injury.

102.   As proximate result thereof, Plaintiffs have suffered and continue to suffer personal injury.

103.   Plaintiffs Nathaniel Foster, Pamela Foster and Natalie Foster have suffered and continue to suffer severe emotional injury as a result of the trauma of seeing their family member injured upon deplaning, turning purple, flat-lining, being given CPR and continuing on in comatose state.

104.   Since the date of the incident, Plaintiff NJ Foster has sustained significant personal injuries, including but not limited to being in a coma, suffering permanent brain damage, suffering severe mental and emotional injuries, and other injuries presently undiagnosed.

105.   Plaintiff NJ Foster has had and in the future will have pain, suffering, worry and anxiety, all to Plaintiff Conservatee's general damages in an amount to be proven at trial.

106.   As a proximate result thereof, Plaintiff NJ Foster incurred, and in the future, will incur medical and related expenses all to Plaintiff's damage in such amount as will be proven at trial.

107.   As a proximate result thereof, Plaintiff NJ Foster has lost the ability to talk, to eat as before (without a feeding tube), to participate in family life, to have a social and romantic life, to attend school and fulfill his dream of becoming a physician.

108.   Plaintiff NJ Foster has and will have lost earning capacity all to Plaintiff's damage in such amount as will be proven at trial.

109.   Plaintiffs Nathaniel and Pamela Foster have been unable to follow their regular employment schedules and have incurred expenses for their son's needed medical care, treatment and related costs and expenses. Plaintiffs' damages in this respect are presently unascertained and are continuing.

110.   As a further proximate result of the acts and omissions of Defendants and each of them, Plaintiffs have sustained substantial economic and non-economic damages, in amounts according to proof at trial.

111.   Defendants' acts and omissions as set forth in this complaint were oppressive and malicious and a knowing and reckless breach of Defendants' statutory duty.

112.   Defendants' acts and omissions were willful and with conscious disregard of Plaintiff Conservatee NJ Foster's rights and safety and in that they subjected him to cruel and unjust hardship in conscious disregard of his rights and safety.

113.   The totality of Defendants conduct, actions and omissions, in the deplaning of Plaintiff NJ Foster was so egregious and such a *gross* deviation the applicable standard of care that malice may be implied to justify a significant award of punitive damages.

114.   Alternatively, or additionally, the totality of Plaintiffs conduct demonstrated altogether an entire want of care raising the presumption of a conscious indifference and reckless disregard to the consequences sufficient to justify a significant award of punitive damages.

115.   Accordingly, Plaintiff is entitled to an award of punitive damages in an amount to be determined at trial for the extreme recklessness, willful and conscious disregard of the rights and safety of Plaintiffs as exhibited by Defendants' acts and omission.

116.   WHEREFORE, Plaintiffs request relief as hereinafter provided.

\\

## SECOND CAUSE OF ACTION
### Negligent Hiring, Supervision or Retention of Employee
(All Plaintiffs Against All Defendants)

117.   Plaintiffs re-allege and incorporate by reference all preceding paragraphs as fully set forth herein.

118.   Plaintiffs claim that they were harmed by Defendants individual agents, supervisors and personnel (identified above as Agents #2-6), and that Defendants United Airlines, ExpressJet Airlines and AirCo Aviation Services are responsible for the harms as alleged above, because they each negligently hired, supervised and/or retained the employees whose actions or omissions caused Plaintiffs' harms.

119.   Defendants hired each of the employees identified above.

120.   Each employee was unfit or incompetent to perform the work for which each was hired.

121.   Defendants at all times relevant herein, knew or should have known that each employee was unfit or incompetent or created a particular risk to all passengers.

122.   The employees' unfitness or incompetence harmed each plaintiff as alleged above.

123.   Defendants' negligence in hiring, supervising, retaining the individuals as described above was a substantial factor in causing Plaintiffs' harm.

124.   WHEREFORE, Plaintiffs request relief as hereinafter provided.

## THIRD CAUSE OF ACTION
### Breach of Contract
(All Plaintiffs Against Defendant United Airlines, Inc. and ExpressJet Airlines, Inc.)

125.   Plaintiffs re-allege and incorporate by reference all preceding paragraphs as fully set forth herein.

126.   On February 6, 2019, Plaintiffs purchased airline tickets from Defendant United Airlines, Inc. thereby entering into a contract with Defendant United Airlines, Inc.

127.   Defendant United Airlines is bound to a contract with Plaintiffs, in part, evidenced by

Defendant United Airlines' Contract of Carriage.

128.   In relevant part, the Contract of Carriage provides that it:

*...constitute[s] the conditions of carriage upon which UA agrees to provide Domestic… Carriage and are expressly agreed to by the Passenger…and [t]he rules herein are applicable to transportation of Passengers…provided by UA…UA's obligations hereunder extend only to the Ticketed Passenger.*

129.   The contract specifically provides in "Rule 18 Service Provided by United Express and Other

Codeshare Partners" as follows:

*UA has arrangements with certain other carriers to enable UA to provide Codeshare services to Passengers on flights operated by these carriers. Transportation provided by UA under a Codeshare arrangement with these carriers is designated by a flight number that includes UA's two-letter airline designator code, "UA"…*

*For Codeshare services on flights operated by another carrier, UA is responsible for the entirety of the Codeshare journey for all obligations to Passengers established in these rules. The rules contained herein with respect to ticketing will apply to UA Codeshare services on flights operated by partner airlines…*

130.   Plaintiffs were ticketed passengers as provided in the Contract of Carriage and had at all times

fulfilled all obligations on their part for the contract of safe carriage.

131.   Defendants however, failed to provide safe carriage, causing significant harm to each Plaintiff.

132.    The activities alleged above on the part of said Defendants, and each of them, is a breach of

the terms, both explicit and implied, of the contract created by Defendant United Airlines, Inc.

selling a ticket to each Plaintiff as well as a breach of Defendant ExpressJet's obligations as a

common carrier to provide safe passage.

133.   As a direct and proximate result of defendants' breach as set out above, Plaintiffs were

damaged as alleged herein, in an amount subject to proof at trial.

134.   WHEREFORE, Plaintiffs request relief as hereinafter provided.

### FOURTH CAUSE OF ACTION
### Negligent Misrepresentation
(All Plaintiffs against Defendant United Airlines, Inc.)

135.   Plaintiffs re-allege and incorporate by reference all preceding paragraphs as fully set forth herein.

136.   Defendant United Airlines via its agent (name unknown, Agent #2) at its Accessibility Desk, on February 6, 2019 misrepresented to Plaintiff Pamela Foster that her son, Plaintiff-Conservatee NJ Foster, a disabled individual, could be accommodated and provided with the necessary disability related assistance as requested on the family's trip from SFO to Monroe, Louisiana via Houston.

137.   Defendant United Airlines representations were untrue as Plaintiff NJ Foster did not receive the necessary deplaning assistance at the Monroe Regional Airport.

138.   Defendant United Airlines, Inc. made the misrepresentation of the material fact without reasonable grounds for believing the representation was true when the representations were made.

139.   Defendant United Airlines, Inc. intended that Plaintiffs rely on this representation.

140.   Plaintiffs reasonably and justifiably relied on Defendant United Airlines, Inc.'s representations and were unaware of the falsity of the representations made by Defendant's agent.

141.   As a result of the reliance upon the agent's representations, Plaintiffs were each harmed. As provided above, Plaintiff NJ Foster suffered catastrophic injury and Plaintiffs Nathaniel, Pamela and Natalie Foster also suffered and continue to suffer severe emotional injury; and

142.   Plaintiffs reliance on Defendant United Airlines, Inc.'s representations were a substantial factor in causing their harm.

143.   WHEREFORE, Plaintiffs request relief as hereinafter provided.

**FIFTH CAUSE OF ACTION**
**Intentional Infliction of Emotional Distress**
(All Plaintiffs against All Defendants)

144.   Plaintiffs re-allege and incorporate by reference all preceding paragraphs as fully set forth herein.

145.   Defendants at all times knew that Plaintiff Conservatee NJ Foster was a disabled, quadriplegic individual, with a trach tube, ventilator and power wheelchair;

146.   Defendants exhibited extreme and outrageous conduct in the following acts and omissions:

i. failing to properly maintain jet bridges (connecting the airport's terminal with the plane);

ii. failing to provide compliant aisle chairs;

iii. failing to properly maintain aisle chairs for use in the deplaning process;

iv. negligently hiring and supervising agents, employees, subcontractors and/or operators;

v. failing to provide the sufficient training for its agents, employees, subcontractors and/or operators;

vi. failing to provide an appropriate number of trained personnel for deplaning Plaintiff Conservatee NJ Foster upon arrival at the Monroe Regional Airport;

vii. failing to provide safe deplaning assistance for Plaintiff NJ Foster, a quadriplegic young man with a tracheal tube and ventilator after agreeing to provide safe passage for him;

viii. failing to exercise care in preventing a catastrophic personal injury to Plaintiff Conservatee NJ Foster;

ix. failing to have and/or implement adequate deplaning policies and procedures;

x. failing to adequately protect Plaintiff NJ Foster, a disabled passenger;

xi. failing to act reasonably under the circumstances to avoid an unreasonable risk of harm to Plaintiff NJ Foster; and

xii. for first denying and then, delaying the voluntary assistance of a good Samaritan (a thoracic and cardiac surgeon no less) from providing medical assistance to Plaintiff Conservatee NJ Foster at a critical time.

147. As provided above, Defendants acts and omissions evidence shocking, outrageous conduct that is so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community.

148. As a result of the aforementioned acts, Defendants caused Plaintiffs to suffer severe emotional distress in the form of severe shock, worry, distress, fright, anxiety, depression, weight loss, weight gain and angst.

149. Defendants conduct by their acts and omissions was a substantial factor in causing Plaintiffs' severe emotional distress.

150. WHEREFORE, Plaintiffs request relief as hereinafter provided.

**PRAYER FOR RELIEF**

1. Wherefore Plaintiffs pray for judgment against Defendant as follows:

a.  For a money judgment representing general and compensatory damages including necessary and reasonable medical expenses and reasonably anticipated future medical expenses;

b.  For a money judgment representing past and future impairment of ability to enjoy life;

c.  For a money judgment representing loss of future earnings, retirement benefits and other employee benefits, and all other sums of money, together with interest on these amounts, according to proof at trial;

d.  For a money judgment for mental anguish, pain and suffering (past, present and for that mental anguish, pain and suffering reasonably likely to occur in the future) according to proof at trial;

e.  For punitive / exemplary damages in an amount appropriate to punish the individual Defendants for their willful, callous, reckless, wrongful and malicious conduct and effectively deter Defendants from engaging in similar conduct and to set an example for other common carriers in the provision of assistance to disabled passengers asking for assistance;

f.  For general and special damages according to proof;

g.  For prejudgment and post-judgment interest;

h.  Reasonable attorneys' fees and costs;

i.  For injunctive relief to ensure that all passengers with disabilities seeking assistance in the embarking and disembarking process are provided the necessary assistance and are provided with equal access and dignity as the law requires; and

j.  For any other relief that the Court deems just and proper.

Dated: May 9, 2019                     Albert Stoll Jr., A Law Corporation

By: _____

Albert G. Stoll, Jr.
Jessica Juarez, Esq.
Albert G. Stoll, Jr. A Law Corp.

//
//
//
//

1

2                                **DEMAND FOR JURY TRIAL**

3    Dated: May  9, 2019                        Albert Stoll Jr., A Law Corporation

4

5
                                               By: _____
6                                              Albert G. Stoll, Jr.
7                                              Jessica Juarez, Esq.
                                               Albert G. Stoll, Jr. A Law Corp.
8                                              Attorneys for Plaintiffs Ward & Tapia

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28