UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NATHANIEL FOSTER, et al.,<br><br>            Plaintiffs,<br><br>      v.<br><br>UNITED AIRLINES, INC., et al.,<br><br>            Defendants. | Case No.  3:19-cv-02530-JD<br><br>**ORDER RE CHOICE OF LAW AND<br>EXPERT WITNESS TESTIMONY** |

On February 8, 2019, plaintiff Nathaniel Foster Jr. was injured during an assisted deboarding of United Airlines Flight 4193 at Monroe Regional Airport in Monroe, Louisiana.  *See* Dkt. No. 74.  Foster was quadriplegic and required a tracheal tube and ventilator to breathe, and a power wheelchair for mobility.  *See id.* at 3.  In the course of deplaning, Foster's tracheal tube was dislodged, preventing him from breathing for a significant period of time.  *See id.* ¶ 66; Dkt. No. 213 at 3-4.  Foster was left in a coma from which he has not awakened.  *See* Dkt. No. 213 at 4.

Foster's mother Pamela, father Nathaniel Sr., and sister Natalie, are also plaintiffs and were with him during the incident.[1]  Dkt. No. 74 ¶ 13.  Pamela purchased the airline tickets from defendant United Airlines, Inc. (United) after calling discuss accessibility arrangements for her son.  *See id.* ¶¶ 4, 6.  The itinerary started with a United flight from San Francisco International Airport in California, the Fosters' home state, to Houston, Texas.  *See id.* ¶ 7.  From there, the family boarded a plane operated by defendant ExpressJet Airlines LLC d/b/a United Express (ExpressJet), with Monroe as the destination.  *See id.* ¶ 20; Dkt. No. 143-16.  Defendant DAL Global Services, LLC (DGS) provided ground and ramp services for United at around 170 to 180 "stations" across the country, including Monroe Regional Airport.  Dkt. No. 143-1 at ECF p. 7.

---

[1] All four plaintiffs share the same last name.  To avoid confusion, Nathaniel Foster Jr.'s mother, father, and sister will be referred to by their first names.

The Fosters have sued United, ExpressJet, DGS, and United Airlines Holdings, Inc. for: (1) negligence and negligence per se; (2) negligent hiring, supervision, and retention; (3) breach of contract; (4) negligent misrepresentation; and (5) intentional infliction of emotional distress.  Dkt. No. 1 (original complaint); Dkt. No. 74 (second amended complaint).  United Airlines Holdings was dismissed because the operative complaint did not adequately allege an alter ego claim.  Dkt. No. 116.

In February and March 2022, the parties filed a raft of summary judgment and *Daubert* motions.  Dkt. Nos. 138, 139, 140, 141, 142, 143, 144, 145, 146, 147, 148, 149, 150.  The motions were terminated without prejudice, and the parties were directed to file a joint statement outlining their trial plan, which could include "a short proffer (1) by any party proposing to re-file a summary judgment motion that explains in no more than 2 pages the issue of undisputed fact suitable for summary judgment, and (2) by any party proposing to re-file a *Daubert* motion that explains in no more than 1 page the reasons for exclusion."  Dkt. No. 193 at 1.  The statement also directed the parties to "state each side's understanding of what state law applies to the case, and why."  *Id.*  The parties filed a joint statement with summary judgment and *Daubert* proffers, Dkt. No. 195, and a status conference was held to discuss these issues, Dkt. No. 205.

After the parties agreed to streamline the case, Dkt. Nos. 210 and 218, the remaining claims are negligence and negligence per se against all defendants, breach of contract against United and ExpressJet, and negligent misrepresentation against United.  Four motions, each fully briefed, are now before the Court for disposition.  The first is whether California or Louisiana law applies to plaintiffs' claims, to the extent that those states' laws materially differ.  Dkt. Nos. 212, 213.  The second is plaintiffs' motion to exclude the testimony of aviation expert Daniel Mazzeo.  Dkt. No. 222.  The third and fourth are two motions for partial summary judgment brought by United.  Dkt. Nos. 216, 217.

The partial summary judgment motions will be addressed in a separate order.  This order resolves the choice-of-law question, and the admissibility of Mazzeo's testimony.  The parties' familiarity with the record is assumed.

**DISCUSSION**

## I.    CHOICE OF LAW

"It is well-established that in diversity cases, such as this one, 'federal courts must apply the choice-of-law rules of the forum state.'" *Rustico v. Intuitive Surgical, Inc.*, 993 F.3d 1085, 1091 (9th Cir. 2021) (quoting *Ledesma v. Jack Stewart Produce, Inc.*, 816 F.2d 482, 484 (9th Cir. 1987)); *see also In re Facebook Biometric Privacy Litig.*, 185 F. Supp. 3d 1155, 1167 (N.D. Cal. 2016). "As the forum state, California will apply its own law 'unless a party litigant timely invokes the law of a foreign state.'" *Chen v. L.A. Truck Ctrs., LLC*, 7 Cal. 5th 862, 868 (2019) (quoting *Hurtado v. Superior Ct.*, 11 Cal. 3d 574, 581 (1974)). "[T]he foreign law proponent must identify the applicable rule of law in each potentially concerned state and must show it materially differs from the law of California." *Wash. Mut. Bank, FA v. Superior Ct.*, 24 Cal. 4th 906, 919 (2001). Choice-of-law questions are examined on an issue-by-issue basis.[2] *See id.* at 920 (stating that "a separate conflict of laws inquiry must be made with respect to each issue in the case").

In this case, the choice-of-law question is whether Louisiana law should determine the availability of punitive damages and the apportionment of liability for compensatory damages, as defendants contend. *See* Dkt. No. 213.

California courts "have 'adopted and consistently applied the so-called "governmental interest" analysis as the appropriate general methodology for resolving choice-of-law questions.'" *Rustico*, 993 F.3d at 1091 (quoting *McCann v. Foster Wheeler LLC*, 48 Cal. 4th 68, 83 (2010)). This analysis entails three steps:

> First, the court determines whether the relevant law of each of the potentially affected jurisdictions with regard to the particular issue in question is the same or different. Second, if there is a difference, the court examines each jurisdiction's interest in the application of its own law under the circumstances of the particular case to determine whether a true conflict exists. Third, if the court finds that there is a true conflict, it carefully evaluates and compares the nature and strength of the interest of each jurisdiction

---

[2] The concept of deciding choice of law on an issue-by-issue basis is formally known as dépeçage. *See dépeçage*, Black's Law Dictionary (11th ed. 2019) ("A court's application of different state laws to different issues in a legal dispute; choice of law on an issue-by-issue basis.").

United States District Court
Northern District of California

> in the application of its own law to determine which state's interest would be more impaired if its policy were subordinated to the policy of the other state.

*Kearney v. Salomon Smith Barney, Inc.*, 39 Cal. 4th 95, 107-08 (2006) (internal quotations and citation omitted); *see also Rustico*, 993 F.3d at 1091; *In re Capacitors Antitrust Litig.*, No. 17-md-02801-JD, 2020 WL 6462393, at *6 (N.D. Cal. Nov. 3, 2020).  Under this approach, the place of the wrong is not necessarily determinative of the law to be applied.  As the California Supreme Court stated in adopting the governmental interest analysis, "when application of the law of the place of the wrong would defeat the interests of the litigants and of the states concerned, we have not applied that law." *Reich v. Purcell*, 67 Cal. 2d 551, 554 (1967).

**A.  Punitive Damages**

Step one of the choice-of-law analysis is readily satisfied with respect to punitive damages: California allows them in a broader range of circumstances than Louisiana does.  "Punitive damages are permissible under California law when there is 'clear and convincing evidence that the defendant has been guilty of oppression, fraud, or malice.'" *Hardeman v. Monsanto Co.*, 997 F.3d 941, 971 (9th Cir. 2019) (quoting Cal. Civ. Code § 3294(a)).  In contrast, the "general public policy in Louisiana is against punitive damages." *Stephenson v. Bryce W. Hotard Sunbelt Rentals, Inc.*, 271 So. 3d 190, 192 (La. 2019) (per curiam); *see also Ross v. Conoco, Inc.*, 828 So. 2d 546, 555 (La. 2002) (same).  Louisiana law makes punitive damages "available only where authorized by statute." *Warren v. Shelter Mut. Ins. Co.*, 233 So. 3d 568, 586 (La. 2017); *see also* La. Civ. Code art. 3546.  Neither party contends that this case implicates one of Louisiana's narrow statutory authorizations for punitive damages.

For step two of the choice-of-law analysis, the Court "must determine what interest, if any, California and [Louisiana] have in seeing their respective laws applied to this case." *Rustico*, 993 F.3d at 1091.  "Only if each jurisdiction involved as a legitimate but conflicting interest in applying its own law will there be a 'true conflict,' requiring us to move on to step three of the analysis." *Id.* (quoting *Cooper v. Tokyo Elec. Power Co. Holdings, Inc.*, 960 F.3d 549, 560 (9th Cir. 2020)).

United States District Court
Northern District of California

4

1    Both sides agree that California has a legitimate interest in seeing its laws governing

2    punitive and compensatory damages applied to this case.  Plaintiffs are residents of California and

3    arranged in California for assistance with boarding and deplaning their United flights.  *See* Dkt.

4    No. 212 at 1-2.  California has an obvious interest in business dealings between California

5    residents and commercial enterprises.  In addition, Foster, who remains "in a persistent vegetative

6    state," *id.* at 2, is being cared for in California, and is subject to a possible lien on a monetary

7    award in this case by the California Department of Health Care Services (DHCS), although there

8    is some indication that DHCS will not pursue a lien, *see* Dkt. No. 219-1 at ECF p. 1.  Overall, as

9    defendants forthrightly acknowledge, "California has an interest in assisting California residents."

10   Dkt. No. 213 at 11.

11    The crux of the dispute at step two is whether Louisiana has a "legitimate but conflicting

12   interest" in seeing its punitive damages law applied.  Plaintiffs say that Louisiana has no interest in

13   enforcing its punitive damages law because this case is not in a Louisiana court and defendants are

14   not "Louisiana corporations or headquartered" there.  Dkt. No. 212 at 4-5.  They cite authority for

15   the proposition that Louisiana's interest in limiting punitive damages "lies in the protection of its

16   judicial system, rather than domestic defendants, from what it might consider inherently

17   speculative awards."  *Pittman v. Kaiser Aluminum & Chem. Corp.*, 559 So. 2d 879, 883 (La. Ct.

18   App. 1990) (citing *Ardoyno v. Kyzar*, 426 F. Supp. 78, 83 (E.D. La. 1976)).  Defendants say that

19   Louisiana law "limits liability of entities engaging in business in Louisiana and protects from

20   excess financial burdens and exposure of non-compensatory, punitive damages."  Dkt. No. 213 at

21   11.

22    It is not dispositive for choice-of-law purposes that Louisiana law might have foreclosed

23   punitive damages had this case been brought there.  The state interest expressed in *Pittman*,

24   namely protecting Louisiana's judicial system from speculative punitive awards, does not create a

25   genuine conflict with California law.  In addition, Louisiana's disallowance of punitive damages

26   may be understood as "the expression of a particular view of the appropriate role of the courts in

27   adjudicating civil disputes:  to compensate, rather than to punish."  *Scott v. Ford Motor Co.*, 224

28   Cal. App. 4th 1492, 1506 (2014).  As Louisiana case law has long noted, "'there is nothing in the

provisions of our Code or settled principles of law which sanctions what are called punitory, vindictive, or exemplary damages -- in other words damages which blend together the interests of society and of the aggrieved individual. . . . Criminal punishment is not to be inflicted in a civil action." *Vincent v. Morgan's La. & T.R. & S.S. Co.*, 140 La. 1027, 1047 (1917) (quoting *Black v. Carrollton R.R. Co.*, 10 La. Ann. 33, 44 (1855) (Slidell, C.J., dissenting)).  But while Louisiana may have "a strong interest in seeing its view of the appropriate policy carried out in its own courts, it has a correspondingly minimal interest in seeing the same policy implemented in the courts of California." *Scott*, 224 Cal. App. 4th at 1506.

This leaves defendants' suggestion that Louisiana limits punitive damages to protect businesses that operate in the state.  There is support for the proposition that "Louisiana's policy in disallowing punitive damages" is motivated by a desire "to protect its domiciliaries from excessive legal liability." *Arabie v. CITGO Petroleum Corp.*, 89 So. 3d 307, 329 (La. 2012) (Knoll, J., concurring in part and dissenting in part); *see also Ardoyno*, 426 F. Supp. at 83 (anticipating that Louisiana's interest in avoiding speculative punitive damages would either be "restricted to avoiding speculative damages against Louisiana domiciliaries" or protecting the integrity of Louisiana courts, and assuming the latter).  This policy affords broader protection than it would appear at first glance, as Louisiana law contemplates that a "juridicial person" -- such as a corporation, *see* La. Civ. Code art. 24 -- can be considered a domiciliary even if Louisiana was not its state of formation or principal place of business.  Under limited circumstances, a corporation that "is domiciled outside [Louisiana], but which transacts business in [Louisiana] and incurs a delictual or quasi-delictual obligation arising from activity within [Louisiana]," will be treated as a Louisiana domiciliary.  La. Civ. Code art. 3548; *see also ASI Fed. Credit Union v. Leotran Armored Sec., LLC*, 259 So. 3d 1141, 1149 n.13 (La. Ct. App. 2018) ("A 'delictual' obligation is an obligation constituting a tort.").

Even so, defendants do not contend that they should be treated as Louisiana domiciliaries for present purposes.  They say only that they deserve the protection of Louisiana's punitive damages law because they conduct some measure of business in the state.  *See* Dkt. No. 213 at 11.  Louisiana has not framed its interest in disallowing punitive damages so broadly.  If conducting

business in Louisiana was the relevant inquiry, its legislature or courts could have said so. Instead, they have indicated that the state's interest -- in addition to protecting the Louisiana judicial system from having to entertain speculative punitive awards and punishments in civil cases -- is in shielding Louisiana domiciliaries from excessive financial burdens, and they have defined the class of entities that qualify as domiciliaries.  *See Arabie*, 89 So. 3d at 314-16.  Having failed to claim domiciliary status or discuss the relevant factors under Louisiana Civil Code Article 3548,[3] defendants have not shown that they are domiciliaries to which Louisiana's protective interest extends.

Defendants' heavy reliance on *McCann* does not point to a different conclusion.  *See* Dkt. No. 213 at 5-6.  Plaintiff McCann was employed by a construction company to install a boiler at an oil refinery in Oklahoma that was designed and manufactured by defendant Foster Wheeler, a company headquartered in New York.  *See McCann*, 48 Cal. 4th at 76-77.  McCann, an Oklahoma resident, was exposed to asbestos during the boiler's installation in 1957, moved to California in 1975, was diagnosed with mesothelioma in 2005, and then sued Foster Wheeler in California.  *See id.* at 76-78.  McCann's claim would have been timely under California law but barred by Oklahoma's applicable ten-year statute of repose.  *See id.* at 82.  The California Court of Appeal concluded that California law applied, reasoning that "Oklahoma's interest in the application of its statute of repose is substantially limited to application of the statute to companies headquartered in Oklahoma and does not equally encompass out-of-state companies who design or construct improvements to real property located in Oklahoma."  *Id.* at 76.  The California Supreme Court reversed, stating that Oklahoma had a legitimate interest in seeing its business friendly, liability limiting rules apply to in-state and out-of-state companies alike, so long as they conducted business in Oklahoma.  *See id.* at 91-92.

*McCann* is not determinative here.  Its holding is limited to cases where there is an "absence of any explicit indication that a jurisdiction's 'business friendly' statute or rule of law is intended to apply only to businesses . . . that have some . . . designated relationship with the state."

---

[3] The analysis under Article 3548 overlaps with California's governmental interest analysis, but is not coextensive with it.  *See* La. Civ. Code arts. 3548, 3542, 3515.

United States District Court
Northern District of California

*Id.* at 92.  That is not the situation here, where Louisiana's limitations on punitive damages do not

include shielding non-domiciliaries or limiting their liability for business conducted in the state.

Defendants, the proponents of applying Louisiana law, have provided no authority to suggest

otherwise.  *See Scott*, 224 Cal. App. 4th at 1506-07 (rejecting a defendant's formulation of

Michigan's interest in applying its punitive damages ban, in part, because it was not "an interest

that has ever been articulated by Michigan courts").

Consequently, Louisiana does not have a legitimate interest in seeing its punitive damages

law applied in this case, and the choice-of-law analysis for this issue ends at step two, in favor of

applying California law.  Even if Louisiana had some identifiable interest in seeing its law applied,

the same outcome would be reached at step three.  Contrary to defendants' suggestion, *see* Dkt.

No. 213 at 6, this is not a straightforward case where, "by entering Louisiana, plaintiff exposed

himself to the risks of the territory, and should not expect to subject defendants to a financial

hazard that Louisiana law had not created."  *Offshore Rental Co. v. Cont'l Oil Co.*, 22 Cal. 3d 157,

169 (1978) (cleaned up).  United marketed and sold airline tickets to the Fosters, California

residents, to provide transportation services from San Francisco to Monroe.  ExpressJet and DGS,

through their contracts with United, helped United to fulfill its business obligation.  Louisiana's

interest in shielding defendants from punitive damages when United, with the aid of ExpressJet

and DGS, effectively "chose to do business in [a state] permitting the imposition of such

damages," is weak at best.  *Scott*, 224 Cal. App. 4th at 1508.  California, on the other hand, has a

strong interest in deterring egregious wrongdoing -- to the extent the complaint alleges such

wrongdoing -- by any corporation that offers and facilitates interstate travel services, originating in

California, to California residents.  California's interest would be more impaired if its policy was

subordinated to Louisiana's policy in this case.

### B.     Apportionment of Liability

For step one of the choice-of-law analysis for this question, California and Louisiana differ

with respect to apportioning liability for compensatory damages.  California law "provides that

liability for economic damages is joint and several, but liability for noneconomic damages is

apportioned according to the principles of comparative fault."  *C.B. v. City of Sonora*, 769 F.3d

1005, 1031 (9th Cir. 2014) (en banc); *see* Cal. Civ. Code § 1431.2(a).  For noneconomic damages, California law provides that "a defendant's percentage of fault is his or her proportionate share of fault as compared with all fault responsible for the plaintiff's injuries," meaning that "damages must be apportioned among the universe of tortfeasors including nonjoined defendants."  *Diaz v. Carcamo*, 51 Cal. 4th 1148, 1156 (2011) (cleaned up).  Louisiana employs a "pure comparative fault regime," *Martin v. Thomas*, 346 So. 3d 238, 245 (La. 2022), the principles of which "apply in 'any action for damages' and apply to 'any claim' asserted under 'any law or legal doctrine or theory of liability,'" *Thompson v. Winn-Dixie Montgomery, Inc.*, 181 So. 3d 656, 664 (La. 2015).  Louisiana law provides that "the negligence 'of all persons,' including those not in the litigation, those without the ability to pay, and the injured victim him- or herself, 'shall' be assigned a percentage of fault."  *Martin*, 346 So. 3d at 245 (quoting La. Civ. Code art. 2323; La. Code Civ. Proc. art. 1812).

At step two, the question again is whether Louisiana has an interest in the application of its comparative fault laws in this case.  "The fundamental purpose of Louisiana's comparative fault scheme is to ensure that each tortfeasor is responsible only for that portion of the damage he has caused."  *Miller v. LAMMICO*, 973 So. 2d 693, 706 (La. 2008).  In contrast to punitive damages, there is no indication that this interest is limited to protecting only Louisiana domiciliaries or the integrity of proceedings in Louisiana courts.  In addition, as defendants suggest, the universe of potential tortfeasors includes nonjoined "entities, municipal governments, and medical providers in Louisiana."  Dkt. No. 213 at 11; *see also id.* at 10 ("The jury may apportion negligence to the four Monroe Fire Department EMTs and firefighters that ineffectively performed CPR for almost 20 minutes without checking the airway to find the dislodged tracheotomy tube.").  Under these circumstances, Louisiana has a legitimate interest in applying its liability-apportioning rules to conduct within its borders, and a true conflict exists.

The analysis at step three also points to the application of Louisiana's comparative fault regime in this case.  As an initial matter, California's interest in the application of its liability rules is muted, given its own skepticism of joint and several liability.  *See Offshore Rental*, 22 Cal. 3d at 166 ("The [comparative impairment] approach incorporates several factors for consideration:  the

United States District Court
Northern District of California

United States District Court
Northern District of California

history and current status of the states' laws; the function and purpose of those laws.").  The California Fair Responsibility Act of 1986, known as Proposition 51, was the ballot initiative passed by voters that created the state's bifurcated approach to the apportionment of liability depending on whether the damages are economic or noneconomic.  *See Evangelatos v. Superior Ct.*, 44 Cal. 3d 1188, 1192 (1988).  The "findings and declaration of purpose" that accompanied Proposition 51 state that "[t]he legal doctrine of joint and several liability, also known as 'the deep pocket rule', has resulted in a system of inequity and injustice that has threatened financial bankruptcy of . . . private individuals and businesses and has resulted in higher prices for goods and services to the public."  Cal. Civ. Code § 1431.1.  While California did retain joint liability for economic damages, this was the result of a compromise that "recogniz[ed] the potential inequity in a rule which would require an injured plaintiff who may have sustained considerable medical expenses and other damages as a result of an accident to bear the full brunt of the loss if one of a number of tortfeasors should prove insolvent."  *Evangelatos*, 44 Cal. 3d at 1198.  But plaintiffs have not said, and the record does not suggest, that there is a serious possibility that they will prevail at trial yet be left empty-handed due to the insolvency of any defendant.

California cases recognize that Louisiana has a significant interest in having its liability-limiting rules apply, as it is the state where the injuries and much of the allegedly tortious conduct occurred.  "California choice-of-law decisions generally hold that when the law of the other state limits or denies liability for the conduct engaged in by the defendant in its territory, that state's interest is predominant, and California's legitimate interest in providing a remedy for, or in facilitating recovery by, a current California resident properly must be subordinated because of this state's diminished authority over activity that occurs in another state."  *McCann*, 48 Cal. 4th at 100-01.  In this context, *McCann* applies with full force.  Unlike in the punitive damages context, there is no explicit indication that Louisiana's interests in applying its comparative fault rules are limited to protecting individuals and businesses that qualify as its domiciliaries.

With respect to conduct occurring within its borders, Louisiana has a strong interest in apportioning liability for compensatory damages.  California has a diminished interest in the application of its joint and several liability rules.  While California also has a cognizable interest in

10

1    seeing that its residents recover the full amount of damages for any injuries they may suffer, that

2    interest is not predominant under recent California case law and the circumstances here. *See, e.g.*,

3    *Castro v. Budget Rent-A-Car Sys., Inc.*, 154 Cal. App. 4th 1162, 1182 (2007) ("Although

4    [plaintiff's] individual financial circumstance and the possible cost to California taxpayers and

5    businesses are legitimate concerns for California, they are not sufficient to reallocate Alabama's

6    and California's respective spheres of law making influence.") (internal quotations and citation

7    omitted). Louisiana's interests in seeing its comparative fault rules apply to this case would be

8    more impaired if California law applied than California's interests if Louisiana law applied.

9    Consequently, Louisiana law will apply to this issue.[4]

10   ## II.      EXPERT WITNESS TESTIMONY

11        Plaintiffs ask to exclude the testimony of Daniel Mazzeo, an aviation expert. Dkt. No.

12   222. Plaintiffs say that Mazzeo's opinions about whether the equipment used to deplane Foster

13   complied with federal regulations are irrelevant, because their case "is about operational

14   negligence and the failure of Defendants to train their agents and employees to proficiency." *Id.* at

15   5. Defendants say that plaintiffs have put the adequacy of the equipment at issue. *See* Dkt. No.

16   223 at 10. The operative complaint alleges that United and ExpressJet "fail[ed] to use the

17   appropriate devices for providing assistance in the deplaning of [Foster], a disabled passenger."

18   Dkt. No. 74 ¶ 97(g). Plaintiffs appear to have conceded the relevance issue by not meaningfully

19   pursuing their argument in their reply brief. *See generally* Dkt. No. 224.

20        Plaintiffs also object that Mazzeo's opinions about the equipment and about the nature of a

21   pilot's duties contain inadmissible legal conclusions. *See* Dkt. No. 222 at 6-7. Defendants say the

22   opinions are admissible because they embrace "an ultimate issue of fact by collecting objective

23   data and demonstrating how that data relates to the federal standard of care." Dkt. No. 223 at 9.

24

25

26   [4] Plaintiffs say that defendants "waived the choice of law issue because they have litigated this
     case under California law since this litigation began." Dkt. No. 212 at 13. Choice-of-law

27   arguments can be waived if not raised in a timely manner. *See In re J.T. Thorpe, Inc.*, 870 F.3d
     1121, 1124 (9th Cir. 2017); *Cassirer v. Thyssen-Bornemisza Collection Found.*, 862 F.3d 951, 977

28   (9th Cir. 2017). But defendants first raised this issue well in advance of trial. *See* Dkt. No. 143 at
     7 n.2. The Court declines to find a waiver.

United States District Court
Northern District of California

An expert's opinion "is not objectionable just because it embraces an ultimate issue" in a case. Fed. R. Evid. 704(a); *see CZ Servs., Inc. v. Express Scripts Holding Co.*, No. 3:18-cv-04217-JD, 2020 WL 4518978, at *2 (N.D. Cal. Aug. 5, 2020). But legal opinions are not the proper subject of expert testimony. *See Reed v. Lieurance*, 863 F.3d 1196, 1209 (9th Cir. 2017); *CZ Servs.*, 2020 WL 4518978, at *2. An expert may not give opinions that are legal conclusions, *see United States v. Tamman*, 782 F.3d 543, 552-53 (9th Cir. 2015), or attempt to advise the jury on the law, *see Strong v. Valdez Fine Foods*, 724 F.3d 1042, 1046-47 (9th Cir. 2013). Consequently, Mazzeo may not offer conclusory opinions that the equipment at issue complies with federal regulations. But he may opine on the applicable standards of care in aviation safety and discuss the facts that are relevant to whether defendants complied with those standards.

## CONCLUSION

Louisiana law will apply to the apportionment of liability for compensatory damages. Witness Mazzeo may testify as discussed.

**IT IS SO ORDERED.**

Dated: April 25, 2023

_____
JAMES DONATO
United States District Judge

United States District Court
Northern District of California

12