Albert G. Stoll, Jr. SBN 164649
astoll@stoll-law.com
Jessica Juarez, SBN 269600
jessica@stoll-law.com
Albert G. Stoll, Jr.| A Law Corporation
235 Montgomery St, Suite 1220
San Francisco, California 94104
Telephone:   (415) 576-1500
Facsimile:   (415) 576-1501

Attorneys for Plaintiffs Nathaniel Foster, Pamela Foster,
Nathaniel Foster, Jr, and Natalie Foster

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA DIVISION

| | |
|---|---|
| Nathaniel Foster, an Individual; Pamela Foster, an Individual; Nathaniel Foster, Jr., by and through his Conservator Nathaniel Foster; and Natalie Foster, an individual, by and through her guardian ad Litem, Pamela Foster,<br><br>Plaintiffs,<br><br>vs.<br><br>United Airlines, Inc., a Delaware Corporation; ExpressJet Airlines, LLC, dba United Express, a Foreign Profit Corporation; DAL Global Services, LLC, a Delaware Limited Liability Corporation,<br><br>Defendants. | CASE NO.: 3:19-cv-02530-JD<br><br>**PLAINTIFFS' TRIAL BRIEF**<br><br>Trial Date: August 7, 2023<br><br>Honorable Judge James Donato |

I. **INTRODUCTION**

Quadriplegic passengers on ventilators are the type of passengers that United expects to be on its flights. Cornett, UA 30(b)(6) Dep. at 102:17 to 103:1.  Delta Global Services (DGS), United Airlines Inc. (United) and ExpressJet Airlines, LLC (ExpressJet) understood well before February 8, 2019, that they needed to train the workers to proficiency who are tasked with boarding and deplaning disabled passengers seeking assistance.  14 C.F.R. §382.95(a)  It's the law, and United paid DGS to make sure its workers were proficiently trained in the lift and transfer of immobile passengers.  14 C.F.R. §382.141.

United instructs DGS to only use their training materials, but United has no training materials for the lift and transfer of completely immobile passengers.  R. Crabbe p. 136:3-9, 140:12-23.  DGS agreed to do the lift and transfer training for United, but DGS does not have any lift and transfer training materials for "immobile" passengers either.  DGS's training materials, Exhibit 202, are only for passengers with "significant mobility impairment."

II. **RELEVANT FACTS PRECEDING FEBRUARY 2019**

Plaintiffs discovered prior incidents involving quadriplegic or immobile United passengers dating back to 2013 that provide UA with notice of: (i) repeated communication failures, both internally and with its contractors; (ii) insufficient training for its own employees and those of its contractors in the provision of enplanement and deplanement services requested by disabled passengers; and (iii) actual injuries or death suffered by disabled passengers due to UA's passenger mishandling in enplanement or deplanement. The incidents give rise to a pattern and practice of disregard for the needs of disabled passengers and compliance with the ACAA. The significance of the complaints cannot be understated:

2013    -    COMMUNICATION. Disabled passenger notified UA and UA recorded in its reservation system that the passenger could not ascend or descend stairs but was nonetheless booked on a flight that required she ascend and descend stairs to board the plane.

2014 - TRAINING. February 16, 2014, quadriplegic passenger complains that UA airline staff wanted to deplane him using a regular wheelchair, not an aisle chair more appropriate for a passenger like him. Exh. 125.01

- TRAINING. April 18, 2014, UA receives a letter from a C-5 quadriplegic that states, "*Once off the plane. I felt myself slipping and said that I was falling. The next thing I knew I was hanging by my securement belts, which were nearly strangling me.*" Exh. 125.13.

- DOT WARNING. In April of 2014, the DOT corresponded with UA noting the 52.32% increase of disability related complaints from the year prior. The DOT noted, "we are concerned with UA's compliance with the ACAA and 14 CFR Part 382, calling particular concern for UA's compliance with enplaning and deplaning (among other violations). Request 9 - 2014-04-10 Investigation Letter, Exh. 222.

2015 - DOT WARNING. January 14, 2015, UA is warned by the DOT for violating 14 C.F.R. §382.95, for failure to provide boarding and deplaning assistance for their wheelchair dependent passenger. United acknowledged it did not meet its legal obligation. Exh. 125.03.

- TRAINING. February 6, 2015. UA admits disabled passenger "slid in chair" only, but did not drop the disabled passenger despite "a flight attendant and other crew on this flight witnessed [redacted] on the ground." Exh. 125.04.

- DOT WARNING. March 17, 2015, UA is warned by the DOT for violating 14 C.F.R. §382.95, "...., we find that United violated 382.95(a), because its wheelchair vendor, G2, did not provide adequate enplaning assistance safeguarding the safety and dignity of (redacted) when he was dropped out of the boarding chair on the jet bridge in Indianapolis." Exh. 125.03.

2016 - DOT FINE. January 7, 2016, the DOT fined UA $2,000,000 as a civil penalty for violations of 14 CFR part 382. UA agreed to improve its quality assurance audits of its wheelchair vendors. The basis of the DOT consent order was for complaints received from UA's customers in the first half of 2014. Exh. 119.

- DOT WARNING. February 9, 2016, UA is warned by the DOT for violating 14 C.F.R. §382.95, when a wheelchair-restricted disabled passenger was dropped. "*At the pinnacle height, I was dropped and fell. I hit my head injured, my left shoulder my left leg and my body was crushed....*" Exh. 125.05.

- TRAINING / INJURY to DISABLED PASSENGER. May 19, 2016 United agreed with the DOT's finding that it violated 14 C.F.R. §382.95(a) when a disabled passenger being pushed out of an airplane tipped over. Exh. 125.06.

2017 - TRAINING. November 11, 2017 UA agrees with the DOT's finding that it again violated 14 C.F.R. §382.95 and §382.141, based on a paraplegic passengers report. "*They then put me in an aisle chair that lacked any seatbelts or leg straps. They*

*then carried me up the stairs, almost dropping me several times on the ascent up the stairs."*

2018 - June 30, 2018 United Airlines again agrees with the DOT's investigation that it was again in violation of 14 C.F.R. §382.95, when a paraplegic passenger reported that the two female individuals sent to assist him were not physically able to do so and their male boss refused to assist." Exh. 125.10.

2019 - TRAINING / INJURY & DEATH of DISABLED PASSENGER. On February 7, 2019 (1 day prior to NJ's incident) at IAH, United's contractor ABM Aviation dropped a quadriplegic man while enplaning. Case No. 4:2021cv01241, U.S. Dist. Court for the So. Dist. of Tx.

- DOT WARNING. November 24, 2018 and March 20, 2019, UA again agrees with the DOT's investigation that it was again in violation of 14 C.F.R. §382.95(a). Again United was warned. Exh. 274.03.

All past incidents should be admitted as evidence of prior knowledge of incident, notice of serious issues affecting their training and those of their contractors in handling disabled passengers requesting enplaning and/or deplaning assistance. The information is also relevant for Plaintiffs' punitive damages claims.

### III.   FEBRUARY 2019

On February 6, 2019, Plaintiff Pamela Foster called the United Accessibility desk three times, for a total of 37 minutes, two days prior to travel, and voluntarily disclosed to United that her son was a ventilator dependent quadriplegic young man and that he would need 4-6 people in boarding and deplaning. Exh. 240, Pamela Foster Dep. at 138-140, 162-164. In the first call, Mrs. Foster was instructed to pay for the tickets first and then call back, *Id*. at 139:3-9. Mrs. Foster was informed that there would be skilled attendants at each airport her son would be flying into. Exh. 255, D. Bacon Dep. at 16, 46-48, 51.

United admits that it agreed to provide transportation and assistance to NJ Foster. (ECF 74 at para. 93; ECF 81 at para. 93). United also agrees that workers who provide assistance to disabled passengers must be trained to proficiency. Rosalie Crabbe, United's manager of accessibility programs and (30(b)(6)), testified that training to proficiency means perfecting the

skill and perfecting the skill means practicing. Exh. 252, R. Crabbe Dep. at 158:14-21. DGS Training Manager Doni Cornett agreed that training to proficiency is required and means "Being well-advanced, adept or skilled in a trade or profession. An employee who is trained to proficiency is one who provides services or accommodations to passengers in the right way the first time. Exh. 248, Cornett Dep. at 230:14-231:4. Training to proficiency is training that ensures that the individual receiving the training becomes accomplished and skilled in the subject matter being taught as appropriate to the duties of that employee." *Id*. at 231:5-231:11.

When NJ Foster landed at MLU, United had no agent or employee present who was skilled at removing a completely immobile passenger from an airplane. C. Gibson Dep. Vol 2 at 327-330. It did, however, have its contractor's agents wear a United uniform. Mignon Jackson Dep. 136:6-11. All workers at MLU who provided assistance to NJ Foster did not know that he was a ventilator dependent quadriplegic until they saw him inside of the jet plane. In fact, Mignon Jackson, an employee of DGS, wearing the United uniform, chose a wheelchair that is typically used for a passenger with a cane. M. Jackson Dep. 26:3-13; 136:9-11.

Given the circumstances, in the words of Rachel White, ExpressJet Flight Attendant, the assistance United agreed to provide NJ Foster did not go well, NJ slid out of the aisle chair by the flight deck door and again at the bottom of the Jet Bridge. R. White Dep. 58:18-59:25, 122:21-24.

IV. **NEGLIGENCE PER SE**

Based on *Gilstrap v. United Air Lines, Inc.*, 709 F.3d 995, 1010 (9th Cir. 2013), both United and ExpressJet are in violation of multiple sections of the ACAA, including the failure to ensure the provision of assistance for deplaning, 14 C.F.R. §382.95; the failure to ensure that its employees and contractors who deal with the public are trained to proficiency, 14 C.F.R. §382.141; and the failure to inform the Foster family and NJ of the fact that no one in Monroe was trained to proficiency, i.e. a service-related limitation on the air carriers' ability to accommodate a

passenger, 14 C.F.R. §382.41. Additionally, the ExpressJet pilot admitted that he had no training regarding the provision of air travel to passengers with a disability, a violation of 14 C.F.R. §382.143.  United claims there was on the job training in Monroe for its workers, but the workers themselves deny this claim. Gibson Dep. V-1 p 190:9-12; R. Brown p. 94:7-14. M. Jackson p. 104:13-18; and p. 80:22-81:8. But there are no training records to verify this claim, a violation of 14 C.F.R. §382.145.  The Plaintiffs have prepared a jury instruction based on CACI 418 with reference to these regulations.

V.     **BREACH OF CONTRACT**

By their contract of carriage ("COC"), Defendants United and ExpressJet agreed to fly NJ Foster and his family from SFO through IAH to MLU. Exh. 21 at p. 9.  Mrs. Foster did what the COC required of her, providing up to 48 hours of advance notice because her ventilator dependent quadriplegic son required service accommodations. *Id.* at p.15 para. C.  Both air carrier Defendants agreed that they would provide transportation and assistance to NJ Foster consistent with the federal aviation regulations. United Answer ECF 81 at paras. 77, 93, 96. ExpressJet Answer, ECF 82 at paras. 77, 78, 96. These facts are not in dispute.  The COC provides it is subject to applicable laws, regulations, rules and security directives from governmental agencies. Exh. 21 at p. 9.  However, when NJ Foster landed at MLU, neither United, nor ExpressJet, had an agent or employee present who was skilled at lifting and transporting a ventilator dependent quadriplegic passenger. Gibson Dep. Vol 2 at 327- 330.  Plaintiffs have asserted that, based on the facts developed in this case, there is no material fact in dispute relevant to breach of contract. The Court has yet to rule on this subject.  *See* ECF 215, Plaintiffs' Breach of Contract Brief As Requested By The Court.

VI.    **NEGLIGENT MISREPRESENTATION**

At the Court's request, Plaintiffs have filed a brief on this subject, *see* ECF 214.

Pamela Foster called the UA Accessibility desk to tell United that her son was quadriplegic, dependent on a ventilator to breathe and would require special assistance. Exh. 240, Pamela Foster Dep. at 138-140, 295-296, and 307-308. She was assured that there would be skilled attendants at each airport NJ would be flying into. Exh. 255, D. Bacon Dep. at 16, 46-48, 51. She was informed that United's skilled attendants will do whatever is necessary to get NJ out of his seat and off the aircraft. *Id*. at 43:8-25, 44-47.  United had no reasonable grounds to believe there would be agents at MLU that were trained to proficiency in the lift and transfer of a quadriplegic person on a ventilator. Crabbe confirmed that United has no training related to the lift and transfer of disabled passengers. R. Crabbe Dep. at 115, 133-135, 140. ExpressJet has no training on how to deplane a quadriplegic passenger. R. Routzahn Dep. at 22, 63, 73:7-10. United hired DGS to perform the lift and transfer of disabled passengers. R. Crabbe Dep. at 135:21-136:9. However, United never audited DGS to see if its agents at MLU were trained to proficiency. *Id.* at 52:19-23, 58:6-59:2. DGS never audited the skill level of the employees assigned to lift and transfer duties at MLU. D. Cornett Dep. at 70, 71. Nor does DGS have a procedure in place at MLU to evaluate how to transport immobile quadriplegic passengers off an airplane. *Id.* at 76:21-77:9. At MLU, the training on how to deplane a quadriplegic passenger consists of asking the passenger the best way to proceed. *Id.* at 129:8-21, 131:1-5.  The representation that there would be skilled attendants at each airport NJ would be flying into is a failure to inform the Foster family and NJ of a service-related limitation on the air carrier's ability to accommodate a passenger, 14 C.F.R. §382.41.

### VII. NEGLIGENCE AGAINST DGS

The plaintiffs assert a claim of negligence against Defendant DAL Global Services, LLC. Through its actions and inactions, DGS engaged in the following negligent behavior: (i) failed to ensure that its CRO, Supervisor Charlotte Gibson knew how to resolve disability complaints and

respond appropriately to passengers; (ii) failed to provide training (written and on the job training) to its employees on how to deplane a completely immobile passenger; (iii) failed to provide training to its employees on how to use the straps of the aisle chair; (iv) failed to provide training on how to interact with a passenger's tracheostomy tube; (v) failed to provide training on how to work with a passenger's ventilator; (vi) failed to provide instruction on how to maintain aisle chairs or, at a minimum, identify when an aisle chair needed service; (vii) failed to accept assistance from a Good Samaritan (who was a seasoned cardiac and thoracic surgeon) and (viii) caused harm to all Plaintiffs by its actions and inactions.

## VIII. INJURY CAUSATION AND DAMAGES

There is no dispute in this case about how NJ Foster's brain was injured. ExpressJet Flight attendant Rachel White witnessed NJ slide out of the aisle chair once by the cockpit door and again at the bottom of the jet bridge. Next Ms. White saw NJ's mouth moving but no words were coming out. Exh. 142. The retained defense neurologist Dr. Steven McIntire wrote in his Rule 26 report, "Based on the records that I have reviewed, Mr. Foster sustained a severe anoxic brain injury because of the displacement of his tracheostomy tube. As a result, he remains in a persistent or chronic vegetative state." No other expert in this case has articulated any other cause of NJ Foster's persistent vegetative state. Dr. McIntire also agrees with the opinions of the Plaintiffs' retained neurologist, Dr. Swanson. "Generally, I agree with his opinions." S. McIntire Dep. at 15:7-11. Nathaniel Foster, NJ's father, Pamela Foster, NJ's mother, and NJ's sister Natalie Foster each witnessed this event. The defendant's expert testified at his deposition that, "...what happened in 2019 was extremely traumatic." S. Katz Dep. at 57:6. Dr. Katz testified that, particularly for the parents, this is the type of trauma that will be with them for the rest of their lives. *Id.* at 66:2-14.

## IX. DEFENSES - COMPARATIVE FAULT CLAIMS

Defendant, DGS claims in a motion in limine opposition dated July, 3, 2023, that "There is abundant evidence that would allow a jury to find the delay of nine minutes contributed to a worse outcome for NJ Foster." DGS plans to argue that the first responders injured NJ Foster. Neither United, nor ExpressJet, are making this claim. (ExpressJet and United's Response to Special interrogatory No. 2 and Rule 26(1)(A)(i) initial disclosures).

DGS's claim fails for the lack of an expert on injury causation, *Pommier v. ABC Ins. Co.*, 715 So. 2d 1270, 1279 (La. App. 1998), "Pommier bore the burden of proof by a preponderance of the evidence of the surgical team's breach of the standard of care and that this breach caused her injury. This requires a "more probable than not" analysis, not a "possibility" or "beyond a reasonable doubt" analysis." Here, no defendant has any expert that has given the opinion that this claimed "delay of nine minutes contributed to a worse outcome." The defendant's had multiple doctors that wrote rule 26 reports, and *not one of them gave that opinion*. The defendant's have not met their burden of proof on this complex medical issue, see Jordan v. Community Care Hospital, 276 So.3rd 564, 578 (La. App. 2019)

DGS failed to take steps to allow the first responders to gain access to NJ. A locked airport security door prevented paramedic Liggin from gaining access to NJ Foster. (S. Liggin p. 26:13 to 27:7). Worse, in the early moments of the emergency, after hearing NJ's mother's scream for help, Dr. Edgar Feinberg, a cardiac and thoracic surgeon, offered to help but was turned away by a DGS desk agent, who chuckled at him. (E. Feinberg, M.D. p. 17:25-18:6) Certainly if the court allows DGS to make this claim, this evidence becomes very relevant.

## X. PUNITIVE DAMAGES

There is no doubt that the past incidents have provided ample notice of known deficiencies and a repeated pattern of failures in the handling of disabled passengers requesting enplaning and

deplaning assistance. These incidents cannot simply be relegated to isolated occurrences that affect one of UA's contractors.  Sadly, the incidents continue.

March 20, 2019, wheelchair user reports to DOT, "Team lifted and tore muscle in right upper arm." United agrees with DOT determination that 14 C.F.R. §382.95(a) was violated. "United states that the proper procedure to assist (redacted) to her seat on the aircraft was not implemented.  United concludes that a violation did occur. The DOT warned United. Exh. 125.11.  May 17, 2019 DOT finds United violates 14 C.F.R. §382.95(a). Exh. 274.02.  June 26, 2019 DOT finds United violates 14 C.F.R. §382.95(a). United also concludes that a violation did occur.  Exh. 274.02.  June 17, 2019, United agrees with DOT determination that 14 C.F.R. §382.95(a) was violated, when a quadriplegic husband was lifted and dropped, bruising his tail bone.  Exh. 125.12.  July 23, 2019 DOT finds and United agrees 14 C.F.R. §382.95(a) was violated. Exh. 274.02.  November 15, 2019 DOT determines and United agrees C.F.R. §382.95(a) was again violated.  United is again warned by the DOT. Exh. 274.02.

Given this history it is not surprising to see the trauma quadriplegic passengers are being subjected to. On February 16, 2022, C4 quadriplegic passenger J. Glasberger experienced a strikingly similar incident to NJ Foster. One person arrived onboard to help him deplane. He asked for additional assistance. He was mishandled in deplaning. "I am slouching terribly and almost falling off the front of the seat…(the second gentleman) declared that I am too heavy to lift, so he left and never returned…".Exh. 275.01 (Glasbergen DOT Complaint), Exhs. 275.02, 275.03, 275.04, 275.05 (Glasbergen video)[1].

The Plaintiffs have already addressed the admissibility of prior similar incidents with respect to negligence, notice, and training, as well as for punitive damages on the grounds that

---

[1] Video of James Glasberger taken on February 16, 2022 (Exhibit 275.02).
https://drive.google.com/file/d/1s2xANJkcrGw7p4cWh0nKO3v8p_5_Tef5/view?usp=sharing  (Last visited 7/6/2023)

these prior incidents show conscious disregard for the needs of disabled passengers seeking equal access to air transportation. But subsequent similar incidents are just as admissible. *Mayfield v. Orozco*, 2016 WL 6217061, at 2 (E.D. Cal. Oct. 24, 2016) ("Evidence post-dating the Mayfield incident could be admissible on the issue of *Monell* liability. … [E]vidence of subsequent events may prove either aggravating or mitigating for purposes of a punitive damages claim.") (citations omitted).

## XI.    PLAINTIFFS REQUEST 30 MINUTES OF INDIVIDUAL VOIR DIRE

"The voir dire examination plays a critical role in securing the right to an impartial jury in civil, as well as criminal, trials." *Darbin v. Nourse*, 664 F.2d 1109, 1112-13 (9th Cir. 1981). Although the practice here is for the Court to conduct the majority of the voir dire, this Court also permits individual voir dire upon request. *Mondragon v. City of Fremont*, 2022 WL 17092571, at 2 (N.D. Cal. May 13, 2022) (court permitted unspecified amount of voir dire per side in a §1983 trial); *Grouse River Outfitters Ltd. v. Oracle Corp.*, 2019 WL 8918902, at 12 (N.D. Cal. June 21, 2019) (court permitted 30 mins. of voir dire per side in 5 day fraud trial); *May v. San Mateo County*, 2017 WL 2305160, at 4 (N.D. Cal. May 26, 2017) (court permitted one hour of voir dire per side in a 5 day civil rights trial).  This is a complex case involving matters that appear very familiar to the jury panel (i.e., air travel), but which are complex (i.e. the ACAA, training, communication, skills in knowing how to deplane a quadriplegic passenger). Plaintiffs request that the court provide them with at least 30 minutes of voir dire, to explore any impermissible biases.

ALBERT G. STOLL, JR | A LAW CORPORATION

Dated: July 6, 2023                        _____/S/_____
Albert G. Stoll, Jr.
Jessica Juarez
Attorneys for Plaintiffs